**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TANYA L. GEORGE | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | CIVIL ACTION NO. H-05-2957 |
| *versus* | § | |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff Tanya L. George's ("George") motion for summary

judgment. George appeals the determination of an Administrative Law Judge ("ALJ") that she is

not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. Having

reviewed the pending motion, the submissions of the parties, the pleadings, the administrative record,

and the applicable law, this Court is of the opinion that George's Motion for Summary Judgment

(Docket Entry No. 7) should be denied, the Commissioner's Motion for Summary Judgment (Docket

Entry No. 12) should be granted, and the Commissioner's decision denying benefits should be

affirmed.

**I.	*Background***

George filed an application for disability insurance benefits with the Social Security

Administration ("SSA") on November 26, 1999, claiming that she had been disabled and unable to

work since February 26, 1999. (R. 18, 68, 77). George alleges that she suffers from a variety of

disabling conditions, including severe pain, insomnia, nerve root irritation, atypical mixed

connective tissue disorder,[1]  memory loss, chronic fatigue syndrome,[2] trouble walking, numbness in the arms and legs, stuttering, inability to walk, confusion, incontinence, "sick a lot," migraines, and occasional dizziness and disorientation.  (R. 77, 108, 120).  After being denied benefits initially and on reconsideration (R. 36-37, 47-50), George requested an administrative hearing before an ALJ.  (R. 51).

A hearing was held on September 19, 2001 in Bellaire, Texas, at which time the ALJ heard testimony from George, Evelyn A. Lyttle, George's mother, Lloyd C. Jones, M.D., a medical expert, and Patricia Cowen, a vocational expert.  (R.472-546).  In a decision dated October 18, 2001, the ALJ denied George's application for benefits.  (R. 18-30).  On November 5, 2001, George appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 10).  On June 17, 2005, the Appeals Council denied George's request to review the ALJ's determination.  (R. 5-7).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  George filed this case on August 22, 2005, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

---

[1] "Connective Tissue Disease," is a heterogeneous group of diseases characterized by abnormal structure or function of one or more of the elements of connective tissue.  *See* ON-LINE MEDICAL DICTIONARY (2002), http://cancerweb.ncl.ac.uk/cgi-bin/omd?connective+tissue+disease.

[2]  "Chronic Fatigue Syndrome" is a persistent debilitating fatigue of recent onset, with reduction of physical activity to less than half of usual, accompanied by some combination of muscle weakness, sore throat, mild fever, tender lymph nodes, headaches, and depression, with the symptoms not attributable to any other known causes.  Its nature is controversial; viral infection (including Epstein-Barr virus and human herpes virus-6) may be associated with it, but no causal relationship has been demonstrated.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1752 (29th ed. 2000).

II.     *Analysis*

A.     *Statutory Bases for Benefits*

Social security disability insurance benefits are authorized by Title II of the Social Security Act ("The Act") and are funded by social security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, George  met the special earnings requirements on February 26, 1999, her alleged onset date, and continued to meet the requirements through the date of the ALJ's decision–October 13, 2001. (R. 29). In order to receive Title II benefits, a claimant must show that she was disabled on or before the expiration of insured status. *See Barraza v. Barnhart*, 61 Fed. Appx. 917, 2003 WL 1098841, at *1 (5th Cir. 2003) (citing *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)). Consequently, to be eligible for disability insurance benefits, George must prove that she was disabled prior to that date.

Applicants seeking disability insurance benefits under Title II must prove "disability" within the meaning of the Act. The Act defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).

**B.** *Standard of Review*

    **1.** *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party is entitled to a judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).

    **2.** *Administrative Determination*

Judicial review of the Commissioner's denial of disability insurance benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole, and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id*.

C.   ***ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4.   If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5.   If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

5

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving

significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.　　The claimant met the special earnings requirements of the Social Security Act on February 26, 1999, the date she stated she became disabled, and continued to meet them through the date of this decision.

2.　　The claimant has not engaged in substantial gainful work since the alleged onset date of disability.

3.　　The claimant has an atypical connective tissue disorder and a chronic pain syndrome, severe impairments.  She has a depressive disorder[3] with some

---

[3] "Depressive Disorders" are mood disorders in which depression is unaccompanied by manic or hypomanic episodes; *e.g.*, major depressive disorder and dysthymic disorder.  *See* Dorland's, *supra*, at 529.

anxiety and a mixed personality disorder,[4] non-severe impairments. She does not have an impairment or combination of impairments that meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's testimony was not fully credible or consistent with the record as a whole.

5.    The claimant has the functional capacity to perform the full range of sedentary work.  She does not have any non-exertional limitations.

6.    The claimant's residual functional capacity is consistent with the demands of her past relevant work as a procurement assistant.

7.    The claimant has the residual functional capacity to perform her past relevant work as a procurement assistant.

8.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. 29-30).  Because the ALJ found that George could perform her past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny George's claim for disability insurance benefits is supported by substantial evidence, the Court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective

---

[4]   "Personality Disorders" are a category of mental disorders characterized by enduring, inflexible, and maladaptive personality traits that deviate markedly from cultural expectations, are self-perpetuating, pervade a broad range of situations, and either generate subjective distress or result in significant impairments in social, occupational, or other functioning.  Onset is by adolescence or early adulthood.  *See* DORLAND'S, *supra*, at 531.

8

evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ, and not the Court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

D.   *Issues Presented*

George contends that the ALJ's decision should be reversed due to fundamental legal errors and a lack of substantial evidence or, in the alternative, be remanded for further proceedings to fully develop the record and to consider George's non-exertional limitations. *See* Docket Entry No. 7. Specifically, George claims that the ALJ erred by: (1) failing to give her treating physician's opinion considerable or great weight; (2) concluding that George's psychiatric impairments are "non-severe;" (3) failing to consider George's non-exertional limitations; and (4) finding that George could perform her prior work as a procurement assistant, in spite of the atypical connective tissue disorder. The Commissioner disagrees with George's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 12.

E.   *Review of ALJ's Decision*

1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled

9

and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).

When a claimant has multiple impairments, the Act requires the Commissioner to "consider the

combined effect of all of the claimant's impairments without regard to whether any such impairment,

if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219

F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a
> sufficient medical severity that such impairment or impairments could be the basis
> of eligibility under the law, we will consider the combined effect of all of your
> impairments without regard to whether any such impairment, if considered
> separately, would be of sufficient severity.  If we do find a medically severe
> combination of impairments, the combined impact of the impairments will be
> considered throughout the disability determination process.  If we do not find that
> you have a medically severe combination of impairments, we will determine that you
> are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined

impairments are compared to the listed impairment most similar to the claimant's most severe

impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove that her impairment or combination of impairments

matches or is equivalent to a listed impairment.  *See Zebley*, 493 U.S. at 530-31; *Selders*, 914 F.2d

at 619.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet

*all* of the specified medical criteria.  *See Zebley*, 493 U.S. at 530.  An impairment, no matter how

severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or

combination of impairments, is equivalent to a listed impairment, she must present medical findings

equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing

20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 404.1526(a).  The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

20 C.F.R. § 404.1526(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

A review of the medical records submitted in connection with George's administrative hearing reveals that she suffers from atypical connective tissue disorder, chronic pain syndrome, and non-severe impairments of depressive disorder and mixed personality disorder.  (R. 29).

In August 1990, George received breast implants.  (R. 468).  In December 1990, George began having problems with her left breast.  *Id*.  George recognized that the size and shape of her left breast was changing; furthermore, George experienced popping and pulling in the left breast. *Id*.

11

On December 17, 1993, George wrote in her journal that she met with Norma Mendoza, M.D. ("Dr. Mendoza") and that Dr. Mendoza wanted her to check into the hospital for 4-6 days for testing; however, this would have to wait for several weeks due to the holidays/birthday as well as Dr. Mendoza's vacation.  (R. 217-218).  Over the next several weeks, George continued to write in her journal, noting her levels of pain, energy and difficulties with her memory.  (R. 202-218).  On December 28, 1993, George experienced mild pain, but was relieved by aspirin.  (R. 215).  She noted that she would like to start working out and had arranged to get some work out tapes.  (R. 215).  On January 2, 1994, George noted in her journal that she had energy; thus, George cleaned the dishes for an hour and one-half, put away groceries, cooked, took down the Christmas tree, boxed all the other decorations, sorted baby pictures and placed them in photo albums, and put away "new kitchen gadgets."  (R. 213).  On January 5, 1994, George wrote that she toured the Kingwood Hospital and was advised of the testing to be conducted.  (R. 211).  On the evening of January 5, 1994, George went bowling and had pizza.  (R. 210-211).

On January 10, 1994, George was admitted in to the Plaza Rehabilitation Hospital at Kingwood, complaining of hip, back, ankle, bilateral shoulder pain as well as numbness and tingling in her extremities.  (R. 177-178).  At the hospital, George was treated again by  Dr. Mendoza. (R. 177-178).  George reported to Dr. Mendoza that she had not been seeing any medical doctors for her complaints, but had been taking over the counter aspirin tablets for her pain.  (R. 177).  George advised Dr. Mendoza that since December 17, 1993, her pain had progressively worsened.  (R. 177). Dr. Mendoza ordered that George receive "comprehensive rehabilitation, work-up, and pain management."  (R. 178).  An ultrasound revealed that George's left breast implant had an irregular shape.  (R. 187).  An MRI of George's bilateral shoulders revealed no significant abnormality and

there was no evidence of rotator cuff tears.  (R. 191).  In her extremities, George demonstrated a normal range of motion and her muscle strength and tone also were normal.  (R. 164).  An x-ray of George's chest and a CT of her lumbar spine both were normal.  (R. 194-195).

On January 12, 1994, George was examined by neuropsychologist Erica Burden, Ph. D. ("Dr. Burden").  (R. 166-176).  Dr. Burden noted that "it cannot be ruled out that [George] experienced changes that are . . . related to toxicity from the silicone implants."  (R. 166).  Dr. Burden diagnosed George as having major depression, single episode, mild to moderate, as well as patterns of dependent personality disorder.  (R. 166).  Dr. Burden evaluated George with a global assessment of functioning ("GAF") rating of 50-53.[5]  (R. 166).  Dr. Burden noted that "neuropsychological findings do not suggest a significant decline in intellectual functioning, but speed of information processing was defective."  (R. 167).  Dr. Burden noted that George "over-reported her symptoms and is subjectively experiencing herself functioning significantly worse than objective findings suggest."  (R. 168).  Dr. Burden recommended psychotherapy to treat George's depression.  *Id*.  In a journal entry dated January 12, 1994, George noted that she took Darvocet for pain and it made her feel like her "old health self" and that sleeping pills also worked.  (R. 206).

---

[5]  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for herself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating 50 of indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job); whereas, a GAF score of 53 indicates "moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See id.* at 34.

On January 13, 1994, George was discharged from the hospital.  (R. 164).  George's final diagnosis was "status post bilateral breast silicone implant," and "chronic fatigue syndrome."  *Id*. Dr. Mendoza reported in the discharge summary that George's extremities showed full range of motion with tenderness in the ankles, hips, and bilateral shoulders.  *Id*.

On January 21, 1994, George noted in her journal that she had not written in a while because she had to catch up on her household duties.  (R. 206).

On February 19, 1994, George underwent a Spect Brain Scan, which demonstrated no asymmetric areas of decreased uptake were identified to indicate regional relative decreased perfusion in any location.  (R. 163).

An EMG conducted on March 3, 1994, revealed evidence of bilateral lumbosacral and cervical nerve root irritation.  (R. 161-162).  No evidence of lumbar or cervical radiculopathy was observed.  Similarly, no peripheral neuropathy was seen at that time.  (R. 161-162).

On March 25, 1994, George was reevaluated by Dr. Mendoza.  (R. 151).  George complained that she was suffering from headaches, numbness in her fingers and toes, fatigue, nausea, confusion, memory loss, and pain in her hip and ankle.  *Id*.  Dr. Mendoza prescribed medication to treat George's condition, and advised her to attend an outpatient pain management program.  *Id*.

On May 9, 1994, George visited Robert Lewy, M.D. ("Dr. Lewy"), who reported that her breasts were deformed and her implants had likely ruptured.  (R. 137).  According to Dr. Lewy, George suffered from "Connective Tissue Disease." (R. 137).  Dr. Lewy opined that George's "disability . . . [makes] her unable to perform some of her usual activities of vocational, avocational and self care, or only perform them with regular or recurring severe pain."  *Id*.

14

In November 1994, George had her implants removed.  (R. 468).  It was reported that the left implant had ruptured and the right implant had leaked.  (R. 468).

On December 17, 1994, Dr. Mendoza examined George.  (R. 149-150).  Dr. Mendoza observed that George had 4 over 5 strength in her upper and lower extremities.  (R. 149).  Dr. Mendoza noted that George was alert and in no acute distress.  (R. 149).  George was able to stand on one leg at a time; she could bend over to touch her toes, squat, and rise from a squatting position, although doing so elicited back pain.  (R. 149).  A straight leg test was negative.  (R. 149).  Dr. Mendoza noted further that George's breast were asymmetrical with the left breast smaller than the right.  (R. 150).  Dr. Mendoza's impression was that George had chronic fatigue syndrome and chronic back pain; however, Dr. Mendoza concluded that George needed "further work-up to rule out chronic fatigue syndrome and connective tissue disease secondary to possible silicone leakage and other problems related to breast implant anomalies." (R. 150).

On September 18, 1995, David E. Burns, M.D. ("Dr. Burns") examined George noting that George's reflexes were normal, and she had good pain-free movement of her joints.  (R. 468).  Dr. Burns reported that George's symptoms were "consistent with the rheumatologic and neurologic disease that has been seen in women with implants."  (R. 468).  Dr. Burns prescribed medications for George's pain.  (R. 468).

During a follow-up visit on September 28, 1995, Dr. Burns prescribed oral B-12 after noting that George's B12 vitamin level was low.  (R. 467).  Dr. Burns reported that the rest of George's lab work did not show any significant abnormalities.  (R. 467).  Dr. Burns changed George's pain medication.  (R. 467).

15

On November 27, 1995, Dr. Burns noted that George's B-12 level was normal; however, Dr. Burns advised George to continue taking the B-12 medication. (R. 465). George advised Dr. Burns that she was concerned about her inability to lose the remainder of the weight she gained during her pregnancy. (R. 465). Dr. Burns recommended exercising more and changing her diet. (R. 465). Dr. Burns reported that fatigue was a problem for George, but she was able to work. (R. 465).

On December 14, 1995, Dr. Burns reported that George was having problems with her husband and was very depressed. (R. 464). Dr. Burns prescribed Prozac to treat George's depression. (R. 464). Dr. Burns noted that George was taking Ambien to sleep and Darvocet to help treat her myalgias[6] and arthralgias[7]. (R. 464).

On February 20, 1996, Dr. Burns examined George during a follow-up visit. (R. 463). Dr. Burns noted that George was separating from her husband because he could not cope with her illness. (R. 463). Dr. Burns also reported that George was currently employed, and should continue with the current medications of Ambien, Prozac and Darvocet. (R. 463). Dr. Burns recommended that George take an over-the-counter medication for her upset stomach. (R. 463). George advised Dr. Burns that she was pleased with her care and tolerating the medications well. (R. 463).

On October 9, 1996, George was admitted into the Cypress Fairbanks Medical Center ("Cypress Hospital") with a diagnosis of acute pyelonephritis.[8] (R. 357). Upon admittance into the

---

[6] "Myalgias" refers to pain in a muscle or muscles. *See* DORLAND'S, *supra*, at 1162.

[7] "Arthralgia" refers to pain in a joint. *See* DORLAND'S, *supra*, at 151.

[8] "Pyelonephritis" is the inflammation of the kidney and its pelvis because of bacterial infection. *See* DORLAND'S, *supra*, at 1498. "Acute pyelonephritis" refers to pyelonephritis of sudden onset characterized by fever, shaking chills, pain in the costovertebral region or flanks, and symptoms of bladder infection. *See id*.

hospital, George's symptoms consisted of fever, chills, severe back pain, and abnormal urine. (R. 358).  During George's hospital stay, she was given IV hydration and prescribed Vicodin and Bactrim.  *Id.*  A radiology consultation concluded that George was also suffering from constipation. (R. 365).  In a discharge summary dated October 11, 1996, Gloria Massey, M.D. ("Dr. Massey"), instructed George to schedule a follow-up appointment with her primary physician, Douglas Tsuchida, M.D. ("Dr. Tsuchida"), for a repeat urinalysis.  (R. 358).

At some point in 1997, George was referred to pain management specialist Michelle Bricker, M.D. ("Dr. Bricker").  (R. 259, 264).  A medication tracking sheet notes that George was prescribed pain medication in November and December 1997.  (R. 259).

In January 1998, Dr. Bricker continued George's pain medication.  (R. 259).  In September 1998, George was admitted to the Cypress Fairbanks Medical Center Hospital and delivered a healthy baby.  (R. 284).  It was reported as a normal delivery.  (R. 284).

In December 1998, after having her baby, George visited Dr. Bricker, complaining or right leg pain.  (R. 263).  Dr. Bricker noted mild tenderness, full motor strength, and that George's hip had full range of movement.  (R. 263).  Dr. Bricker prescribed pain medication and referred George for a lumbar MRI.  (R. 263).  On December 10, 1998, a lumbar MRI revealed that George had no disc herniation or other abnormalities of her spine.  (R. 262).  Her discs were "well maintained," and vertebral segments had normal height, signal and alignment.  (R. 262).

Dr. Bricker's medication tracking sheet reveals that George was taking an antidepressant, Zoloft, in January 1999.  (R. 259).  In February 1999, George visited Dr. Bricker for a follow-up visit, complaining of right hip and foot pain.  (R. 261).  Dr. Bricker's impression was George had chronic pain syndrome and lumbar radiculopathy.  (R. 261).  Dr. Bricker also noted that George was

17

taking Zoloft.  (R. 261).  By March 1999, Zoloft was no longer noted on George's medication tracking sheet.  (R. 259).  In August 1999, Dr. Bricker's noted in George's progress notes "arthritis vs. lumbar radiculopathy."  (R. 256).

On September 7, 1999, George visited the Cypress Hospital emergency room complaining of right flank[9] pain and fever.  (R. 332, 346).  George was examined by Scott Rivenes, M.D. ("Dr. Rivenes"), who noted that George's past medical history included chronic pain syndrome and urinary tract infections.  (R. 346).  A neurological/psychological evaluation revealed that George was oriented, her mood and affect were normal, and there was no evidence of a memory deficit.  (R. 343). George received two doses of Demoral, a dose of Phenergan, and was prescribed Bactrim.  (R. 331, 347).  Dr. Rivenes concluded that George was suffering from acute right flank pain, a urinary tract infection, vomiting, and chronic pain syndrome.  (R. 347).

On September 8, 1999, George returned to the Cypress Hospital emergency room.  (R. 332). George was examined by David M. Gould, M.D. ("Dr. Gould").  (R. 332).  George was suffering from the same symptoms she had on the previous day, with new symptoms of nausea.  (R. 332). Under "Past Medical History," Dr. Gould reported that George had a medical history of mixed connective tissue disease and chronic fatigue.  (R. 332).  Dr. Gould also reported that George was taking Darvocet, Paxil, and birth control pills.  (R. 332).  Dr. Gould reported further that George's back was tender on the right side.  (R. 333).  George was admitted into the Cypress Hospital with a diagnoses of acute pyelonephritis.  (R. 333).

---

[9] "Flank" is the side of the body inferior to the ribs and superior to the illium; also called latus.  *See* DORLAND'S, *supra*, at 683.

On September 11, 1999, George was discharged from Cypress Hospital.  (R. 331).  Dr. Gould noted that George still had some nausea at the time of discharge, but that she was being sent home in an improved condition.  (R. 331).  Dr. Gould noted that "[a]ctivities will be tolerated."  (R. 331).  Dr. Gould prescribed an antibiotic and a pain reliever to treat George's condition.  (R. 331).

On January 13, 2000, Dr. Bricker reported in George's progress notes "good pain control," and her impression that George had "arthritis vs. lumbar radiculopathy."  (R. 256).

On February 12, 2000, Barbara Moore, M.D. (" Dr. Moore") of Medtex (Medical Testing & Examination Center), performed a psychological evaluation of George, following complaints of memory loss and depression.  (R. 222-226).  Dr. Moore reported  that George's speech was normal in rate, volume, and tone.  (R. 224).  Dr. Moore reported further that George's thoughts were logical and goal directed, with no evidence of a thought disturbance.  (R. 224).  Under "Sensorium,"  Dr. Moore noted that George was oriented to person, place and time.  (R. 224).  Dr. Moore also noted that George's judgment and memory were intact.  (R. 224).  Under "Activities of Daily Living," Dr. Moore reported that George was "capable of driving," "reads a great deal," "goes out to eat," and "enjoys playing with her children and shopping."  (R. 224-225).  Under "Concentration, Persistence, and Pace," Dr. Moore reported that George "was able to maintain a good level of concentration and stay on task throughout the interview."  (R. 225).  Dr. Moore diagnosed George with a "Mood Disorder (depression)" due to chronic pain syndrome.  (R. 225).  Dr. Moore evaluated George as having a GAF score of 60.[10]  (R. 225).

---

[10]  A GAF rating of 60 indicates "moderate" symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See* DSM-IV-TR, *supra*, at 34.

19

On February 18, 2000, Ronald Devere, M.D. ("Dr. Devere") with Medtex conducted a neurological examination of George.  (R. 227-229).  Dr. Devere reported that George was "alert and oriented," and that her strength was "normal in both arms and legs."  (R. 228).  Dr. Devere noted that when he tried to check the strength of George's muscles, he did not get the impression that George was experiencing very much pain or difficulty.  (R. 228).  Dr. Devere noted further that "there is some minimal tenderness in George's thigh and low back," but George can "pick up small objects," and can perform "tandem walking without any difficulty."  (R. 228).  Under "Clinical Impression," Dr. Devere reported that George had a "normal neurologic examination," and has "mostly subjective symptoms of pain, numbness and fatigue."  (R. 228).  Under "Work Related Functions," Dr. Devere noted that based on objective evidence, "it is my opinion that [George] should be able to sit, stand and move about, and . . . handle small objects in both her hands without any difficulty."  (R. 229).  Dr. Devere reported further that George's "hearing and speech appear to be normal," that her "range of motion of most of her joints, including her back, seem to be normal . . .," and that she has "no difficulty with active or passive range of motion."  (R. 228).  Dr. Devere also reported that George has "no spasm, no loss of motion, no atrophy, no sensory or reflex changes," "no joint deformities," and she "is able to walk . . . without using a cane or crutches."  (R. 228).

On February 22, 2000, Joanne Y. Kim, M.D. ("Dr. Kim"), performed an electromyography[11] ("EMG") test on George, following George's complaints of right leg jerking and memory deficits.  (R. 248-249).  Dr. Kim reported a normal EMG study.  (R. 249).

---

[11]  "Electromyography" is an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals.  *See* DORLAND'S, *supra*, at 576-577.

On March 16, 2000, a non-examining physician, A. Boules, M.D. ("Dr. Boules"), reviewed George's medical records for the state disability services—a component to the SSA's evaluation for benefits.  (R. 233-241).  Dr. Boules completed a Psychiatric Review Technique Form, concluding that George did not meet Listing 12.04 (Affective Disorders).  (R. 233-234).  Dr. Boules found that George's alleged limitations were not fully supported by the evidence of record. (R. 234).  Dr. Boules' assessment was reviewed by B. J. Blacklock, M.D. ("Dr. Blacklock") and he affirmed the assessment, as written.  (R. 242).

On April 10, 2000, Dr. Bricker noted that multiple tests, including needle EMG, were normal. (R. 255).  Dr. Bricker's impression remained the same, "arthritis vs. lumbar radiculopathy." (R. 255).  Dr. Bricker continued George's medication.  (R. 255).

On April 17, 2000, Jaime Ganc, M.D. ("Dr. Ganc") performed a psychiatric evaluation of George in relationship to her appeal for social security benefits.  (R. 270-73).  Dr. Ganc's evaluation revealed that George's "memory for past and present events was slow but preserved."  (R. 272). Under "Functional Information," Dr. Ganc reported that George "needs to rest after doing something for half an hour," however, George still "dresses herself," "cooks for her family,"and is "able to handle her own personal affairs." (R. 272).  Dr. Ganc noted that George is within the "mild to severe level of depression" based on the "Beck Depressive Inventory Scale."  *Id*.  Psychiatric testing revealed that George tends to be "suspicious, withdrawn, [and] depressed."  *Id*.  Testing also revealed that George has a tendency to "isolate herself," has difficulties concentrating, and feels that she cannot handle stress.  (R. 272-273).  Under "Diagnostic Impression," Dr. Ganc reported that George suffers from: (1) Adjustment disorder with severe depressive features reaching agitated proportions; (2) mixed personality disorder with paranoid and passive-dependent features; and  (3)

severe atypical connective tissue disease.  (R. 273).  Dr. Ganc reported further that George has a

GAF score of 40.[12]  *Id.*  Dr. Ganc concluded that George "is suffering from severe physical problems

that are handicapping her;" therefore, "[s]he will require long-term individual psychotherapy.  (R.

273).          On  June  9, 2000, George visited the emergency room of Cypress Hospital,

complaining of nausea, vomiting, and diarrhea.  (R. 381-382).  George was treated by  Ronald J.

Taylor, M.D. ("Dr. Taylor").  (R. 381).  Dr. Taylor reported that George was "in no acute distress,"

noting that her blood pressure was 114/65, and her temperature was 99.8 degrees.  *Id.*  Under

"Assessment," Dr. Taylor reported that George had probable gastroenteritis.[13]  (R. 382).  Dr. Taylor

also observed that George had slight hematuria.[14]  Dr. Taylor prescribed antibiotics for George and

instructed her to continue taking Phenergan.  (R. 382).

On July 2, 2000, a non-examining physician, Mandi Shartlan, M.D. (" Dr. Shartlan"),

reviewed George' s medical records for the state disability services—a component to the SSA' s

evaluation for benefits.  (R. 274-282).  Dr. Shartlan completed a Psychiatric Review Technique

form, concluding that George did not meet Listing 12.04 (Affective Disorders) or Listing 12.08

(Personality Disorders).  (R. 274).

---

[12]  A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times
illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family
relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable
to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-
IV-TR, *supra*, at 34.

[13]  "Gastroenteritis" is an acute inflammation of the lining of the stomach and intestines, characterized by
anorexia, nausea, diarrhea, abdominal pain, and weakness.  *See* DORLAND'S, *supra*, at 731.

[14]  "Hematuria" refers to blood in the urine.  *See* DORLAND'S, *supra*, at 798.

On February 8, 2001, Dr. Bricker diagnosed George with "Right-sided sacroilitis,"[15] and performed a "right sacroiliac[16] joint injection" on George. (R. 439, 441). On February 20, 2001, George had an appointment with her primary physician David Gould, M.D. ("Dr. Gould"). At that time, George complained of sinus congestion. (R. 415-416).

On June 14, 2001, Dr. Kim completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)," concluding that George could lift up to 20 pounds, occasionally, and 10 pounds frequently. (R. 428-431). In addition, Dr. Kim reported that George could sit less than 6 hours a day and pushing and pulling were limited in her upper and lower extremities. (R. 429).

On June 21, 2001, Dr. Bricker completed a "Medical Source Statement of Ability to do Work-Related Activities" in relation to George's physical condition. (R. 434-437). Dr. Bricker concluded that George could lift and carry 10 pounds, stand, and walk at least 2 hours in an 8-hour workday. (R. 434-437).

On August 15, 2001, Dr. Ganc performed a full psychiatric evaluation of George in relation to her appeal for social security benefits. (R. 451-455). Dr. Ganc noted that George was able to drive herself to his office despite her pain. (R. 451). During this evaluation, George complained that her "condition ha[d] deteriorated," and that she was "fatigued all the time." (R. 451). Under "Mental Status," Dr. Ganc reported that George "ha[d] a sense of despair and hopelessness," was in constant pain, and could not concentrate. (R. 453). Dr. Ganc also reported that George was

---

[15] "Sacroiliitis" refers to inflamation (arthritis) in the sacroiliac joint. *See* DORLAND'S, *supra*, at 1593.

[16] "Sacroiliac" denotes the joint or articulation between the sacrum and ilium and the ligaments associated therewith. *See* DORLAND'S, *supra*, at 1593.

oriented to person, place, and time.  (R. 453).  Under "Daily Functioning," Dr. Ganc noted that

George was "very weak, but she [was] still able to take care of her own personal hygiene and

personal affairs."  (R. 454).  Dr. Ganc noted further that George slept "4-5 hours at night," had a

decreased appetite, and "cannot concentrate."  (R. 454).  Based on Dr. Ganc's evaluation, George

scored a 51 on the "Beck Depression Inventory Scale," which placed her at a severe level of

depression.  (R. 454).  Dr. Ganc's evaluation revealed that George was dependent, paranoid, had a

sense of isolation, was withdrawn, had a sense of being damaged, and had no defense mechanisms.

(R. 454).  Under diagnosis, Dr. Ganc reported that George suffered from (1) major depressive

disorder with agitated portions; (2) mixed personality disorder with paranoia and passive dependency

issues; (3) severe connective tissue disorder; and (4) chronic pain syndrome.  (R. 455).  Dr. Ganc

scored George's GAF as 35.[17]   (R. 455).  Under "Prognosis," Dr. Ganc noted that George's

"condition ha[d] deteriorated," and she was "unable to do any type of work" at that time.  *Id*.


On the referral of George's counsel, on August 20, 2001, George was assessed by vocational

evaluator Wayne Gray Alfred ("Alfred") as to her capacity to perform work.  (R. 447-450).  Alfred

reported that George demonstrated the physical capacity for perhaps light work and more definitively

for sedentary work that allows for alternating between sitting and standing.  (R. 449).  Alfred further

noted that physical exertion such as filing for 1 ½ hours resulted in trembling, shaking, and physical

---

[17]  A GAF rating of 35 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-IV-TR, *supra*, at 34.

exhaustion.  (R. 449).  Alfred opined that this suggested that George's capacity to endure a 40 hours of work week after week was questionable.  (R. 449).

In a letter dated October 11, 2001, Dr. Bricker reported that she had been seeing George since October 30, 1997, for complaints of severe chronic pain.  (R. 31).  Dr. Bricker reported that in 1991, George began experiencing unexplained pains primarily in her right leg.  (R. 31).  Dr. Bricker noted that, as of October 2001, George's major compliant was right hip and leg pain.  (R. 31).  Dr. Bricker reported that George can only sit for "30 minutes at a time because she becomes very stiff after sitting, making it very difficult for her to stand up."  (R. 31).  Dr. Bricker reported further that upon standing George felt "a popping sensation in [her] right hip and foot[,] and it may take her 30 minutes to work out the pain and stiffness."  (R. 31).  Dr. Bricker reported that George suffered from "chronic pain syndrome . . . , the origin of which is not clear at this time."  (R. 31).  Dr. Bricker opined that George was unable to perform a sedentary occupation effectively or consistently, because George's condition affected her ability to sit for prolonged periods of time.  (R. 31).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little

25

or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, George alleges that the ALJ erred by failing to accord Dr. Bricker's opinions regarding George's chronic pain syndrome controlling or great weight.  *See* Docket Entry No. 7.  In a letter "To Whom it May Concern," dated October 11, 2001, Dr. Bricker reported that George was unable to perform a sedentary occupation because George's condition affected her ability to sit for prolonged periods of time.  (R. 31).  This letter must be discounted, however, as it contradicts Dr. Bricker's June 2001 "Medical Source Statement of Ability to do Work-Related Activities."  (R. 434-437).  Moreover, an opinion that a claimant is "unable to work" or is "disabled" is an opinion on a legal issue that is reserved for the Commissioner and, as such, is never entitled to "controlling weight." 20 C.F.R. § 404.1527.  Therefore, the ALJ is not required to give Dr. Bricker's opinion regarding George's ability to work controlling or great weight.  A physician's opinion that a claimant is "disabled" or "unable to work" is not the type of doctor's opinion that is ever given controlling weight or given "special significance." *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).  Because the ALJ is not required to give Dr. Bricker's opinion regarding

26

George's ability to work controlling weight, George's contentions of reversible error are unfounded.

George also argues that the ALJ erred by finding her mental impairments to be non-severe. *See* Docket Entry No. 7. George cites Dr. Burden's January 12, 1994, report to support her contention of severe mental impairments. *See id.* In this report Dr. Burden diagnosed George as having "major depression with features of a pseudodementia."[18] (R. 167). Contrary to George's contentions, substantial record evidence supports the ALJ's finding that George's alleged mental impairments were not severe. As an initial matter, Dr. Burden's diagnoses from 1994 was five years prior to the alleged onset date, and George demonstrated the ability to work in 1994 and subsequent years as evidenced by her earning record. (R. 74). It appears that George was prescribed an antidepressant (Zoloft) for a few months (*i.e.*, January to March 1999), shortly after the birth of her child in September 1998. (R. 259, 284). It does not appear that George continued taking an antidepressant thereafter, and there is no indication in the record that she received psychological treatment otherwise. (R. 111, 456). Indeed, a neurological/psychological evaluation dated September 8, 1999, reported that George was oriented, her mood and affect were normal, and there was no evidence of a memory deficit. (R. 343).

Moreover, a report issued by Dr. Moore on February 12, 2000, diagnosed George with a "Mood Disorder (depression)" due to chronic pain syndrome, but noted that George's concentration level was intact and that her speech was normal in rate, volume, and tone. (R. 224-225). Dr. Moore reported further that George's thoughts were logical, with no evidence of a disturbance. (R. 224).

---

[18] "Pseudodementia" is a disorder resembling dementia but that is not due to organic brain disease and is potentially reversible by treatment; usually due to depression or other psychiatric disorder. *See* DORLAND'S, *supra,* at 1482.

Dr. Moore observed that George was oriented to person, place and time, and that her judgment and memory were intact. (R. 224). Dr. Moore noted that George was "capable of driving," "reads a great deal," "goes out to eat," and "enjoys playing with her children and shopping." (R. 225). Furthermore, Dr. Devere concluded in a neurological examination of George on February 18, 2000, that George was "alert and oriented," had a "normal neurologic examination," and had "mostly subjective symptoms of pain, numbness and fatigue." (R. 228). The reports of Drs. Moore and Devere do not suggest that George suffered from severe mental impairments.

Unlike the reports of Drs. Moore and Devere, Dr. Ganc's reports are not based on objective clinical findings, but were, instead, prepared "in relation to her appeal for social security." (R. 270, 451). In his April 2000 and August 2001, psychiatric evaluations of George, Dr. Ganc diagnosed George with adjustment disorder, mixed personality disorder, and atypical connective tissue disease. (R. 270-273, 451-455). Dr. Ganc reported further that George had a GAF score of 40. (R. 273). Dr. Ganc's assessment appears to be based largely on George's historical statements regarding difficulties in interpersonal relationships and her inability to work, as Dr. Ganc's assessments were not consistent with the objective clinical findings from other physicians. In fact, when George visited the Cypress Hospital emergency room in June 2000, her mental examination revealed that she was oriented, and her mood and affect were normal. (R. 392). Furthermore, aside from the SSA physician (Dr. Shartlan) finding in July 2000 that George did not meet either Listing 12.04 or 12.08 (R. 274), there are no other medical records pertaining to a mental disorder from April 2000 until August 2001, when Dr. Ganc performed another evaluation of George. In fact, in June 2001, George's treating physician, Dr. Bricker, completed a "Medical Source Statement of Ability to do Work-Related Activities" that did not mention any alleged mental limitations. (R. 434-437).

28

Finally, in her disability application, George reported that she did not have mental or emotional problems that significantly affected her day to day living or work. (R. 111). Additionally, she indicated that she had not received any mental or emotional treatment. (R. 111). She noted that she had taken anti-depressants to assist in pain relief, but she did not like the side effects and they were too expensive, so she quit taking them. (R. 111). She further responded on the application that she did not think she needed a mental or emotional evaluation. (R. 111). Moreover, at her administrative hearing, George conceded that she was not seeing a psychiatrist for treatment of her alleged depression. (R. 456).

Taking in to consideration all the medical evidence of record, including the testimony heard at the administrative hearing, the ALJ fully developed the record and properly found that George did not meet any Appendix 1 Listing.

### 2.      *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a claimant alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the claimant's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these

determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

30

At the administrative hearing, George testified regarding her complaints of pain.  (R. 477-515).  The ALJ determined that George's subjective complaints were not credible.  (R. 28).  The ALJ's decision indicates that he considered objective and subjective indicators related to the severity of George's pain:

> The claimant testified that her pain was "tremendous" and "all encompassing."  The claimant alleged that she had "frequent" . . . and severe pain attacks that . . . occurred without warning.  She describes herself as walking like an 80 year old woman.  According to the claimant, the pain woke her up from a dead sleep, and sometimes she walked backwards to relieve the pain . . . .  The claimant was asked to rate her pain on a scale of 0 to 10 with 0 representing no pain and 10 being excruciating pain . . . .  She testified that when she took pain medication her pain level was a 7 level and when she was not on medication her pain was at a 10 "or 20" level.  She stated that she also experienced fatigue, and it could be crippling in itself.  She testified that she had to have assistance with practically everything she did.

> The claimant testified that she was the main care giver for her children.  Other activities of daily living included watching television and doing household chores for small periods of time.  She stated that she . . . had not gone on any school trips although she had gone to an open house at school . . . .  The claimant testified that she took a vacation to Mexico in 2000 . . . .  She testified that in 2001 she went on a cruise to Mexico to celebrate her in-laws 50th wedding anniversary.

(R. 25).

Based on a review of the entire record, the Court does not doubt that George suffers from pain; however, the medical records do not support a finding that George's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  For example, Dr. Moore reported that George was "capable of driving," "reads a great deal," "goes out to eat," and "enjoys playing with her children and shopping."  (R. 224-225).  Furthermore, Dr. Devere reported that George was "alert and oriented," and that her "strength is normal in both arms and legs."  (R. 228).  Dr. Devere noted that when he tried to check the strength of George's muscles, he did not get the impression that George

31

was experiencing very much pain or difficulty.  (R. 228).  Dr. Devere noted further that "there is

some minimal tenderness in George's thigh and low back," but George can "pick up small objects,"

and can perform "tandem walking without any difficulty." (R. 229).  Dr. Devere reported further that

George's "hearing and speech appear to be normal," that her "range of motion of most of her joints,

including her back, seem to be normal . . .," and that she has "no difficulty with active or passive

range of motion." (R. 229).  Dr. Devere also reported that George has "no spasm, no loss of motion,

no atrophy, no sensory or reflex changes," "no joint deformities," and she "is able to walk  . . .

without using a cane or crutches."  *Id.*

Accordingly, there is substantial evidence that supports the ALJ's finding that George's

subjective reports of pain do not rise to the level of disability.  *See Ortiz v. Barnhart*, 70 Fed. Appx.

162, 164 (5th Cir. 2003); *Jones v. Barnhart*, 35 Fed. Appx. 390 (5th Cir. 2002).

### 3.    *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> ". . . only if [her] physical or mental impairment or impairments are of such severity
> that [she] is not only unable to do [her] previous work but cannot, considering [her]
> age, education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work exists
> in the immediate area in which [she] lives, or whether a specific job vacancy exists
> for [her], or whether [she] would be hired if [she] applied for work . . . ."

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a

claimant's functional capacity, age, education, and work experience allow her to perform work in

the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309

F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the

Commissioner fulfills this burden by pointing out potential alternative employment, the claimant,

in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited

33

> to less than the full range of sedentary work are disabled will depend primarily on the
> nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR

96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that

the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine

that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's

exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir.

1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, the medical expert testified, based on his review of the record, that George

was capable of performing sedentary activities.  (R. 524).  The vocational expert further testified that

George's past relevant work as a purchasing agent, procurement assistant, and administrative

assistant were all sedentary, semi-skilled jobs.  (R. 526).  Although George argues that the ALJ erred

in finding she could perform her past relevant work, her contention is unfounded.  George testified

that her past work was basically a desk job with a lot of library filing, some travel, and periodic visits

to manufacturing facilities.  (R. 78).  In her "Work History Report" of her disability application,

George stated that her past work as a procurement assistant involved walking up to two hours a day,

standing up to one hour a day, and sitting up to six hours a day.  (R. 93).  In response to hypothetical

questions posed by the ALJ, the VE testified that a person with George's residual functional capacity

for sedentary work could perform her past relevant work as a procurement assistant.  (R. 529).

The Fifth Circuit has observed that in determining a claimant's ability to work, a vocational

expert " . . . is familiar with the specific requirements of a particular occupation, including working

conditions and the attributes and skills needed."  *Carey*, 230 F.3d at 145.  Unlike the Dictionary of

Occupational Titles, which simply gives a general description of the job duties involved, a vocational expert is able to compare the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion as to whether the claimant can perform the specific job. *See Fields*, 805 F.2d at 1171.  Because the hypothetical question articulated by the ALJ reasonably incorporated George's impairments, the ALJ properly evaluated and accepted the VE's testimony. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  As such, there is sufficient evidence to support the ALJ's finding that George has the residual functional capacity to perform the full range of sedentary work, including her past relevant work as a procurement assistant.  (R. 29).

**III.   *Conclusion***

In sum, the record provides substantial evidence supporting the Commissioner's decision that George is not disabled.  Accordingly, it is therefore

**ORDERED** that George's Motion for Summary Judgment (Docket Entry No. 7) is **DENIED**. It is further It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this _____ day of August, 2006.

Calvin Botley
United States Magistrate Judge